JOON H. KIM
Acting United States Attorney for the
Southern District of New York
By:     CHRISTOPHER B. HARWOOD
        ANTHONY J. SUN
        Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2728 / 2810
Email: christopher.harwood@usdoj.gov
       anthony.sun@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ALEXANDER NEUMEISTER, <br><br> Defendant. | 17 Civ. 9287 <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff the United States of America (the "United States" or "Government"), by its

attorney, JOON H. KIM, Acting United States Attorney for the Southern District of New York,

herein alleges for its complaint as follows:

**INTRODUCTION**

1.      This action is brought by the United States against defendant Alexander

Neumeister ("Neumeister"), pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the

"FCA"), and the common law to recover damages sustained by, and penalties owed to, the

United States as a result of misconduct by Neumeister in connection with his oversight of

numerous federally-funded research studies.  As set forth in detail below, during the period 2012

through 2014 ("Covered Period"), Neumeister misappropriated federal funds that were supposed

to have been used to advance federally-funded research studies, but instead were used by Neumeister for his own personal benefit.

2.      During the Covered Period, Neumeister was a professor in the psychiatry department of a medical school located in the Southern District of New York (the "School").  In his capacity as an employee of the School, Neumeister served as the principal investigator for a variety of research studies, many of which were funded by grants issued by the National Institute of Mental Health ("NIMH").  The studies concerned stress-related disorders, including post-traumatic stress disorder.  As the principal investigator for these research studies, Neumeister was responsible for overseeing all aspects of the studies, including the collection, analysis, and interpretation of the study data.

3.      Neumeister was also given a credit card by the School, referred to internally within the School as a "P-Card." Neumeister was authorized to charge study-related expenses to the P-Card, and then to identify the specific funding source to which each such expense should be allocated.  In identifying the funding source to which a particular expense should be charged, Neumeister was able to allocate the expense to specific grants, including NIMH grants, or to one or more expense accounts maintained by the School.  To the extent that Neumeister allocated a particular expense to a specific grant, such as an NIMH grant, the School would pay the expense using funds it obtained from the grant source.  Similarly, to the extent that Neumeister allocated a particular expense to an expense account maintained by the School, then the School would pay the expense using its own funds.

4.      As a condition of receiving an NIMH grant for a research study, the School was required to certify to NIMH, among other things, that the NIMH grant funds would be used for the purposes set forth in the grant application.

2

5.      Moreover, before the School submitted a grant application to NIMH, the School required Neumeister to sign a certification affirming, among other things, "that the statements [in the grant application] are true, complete and accurate to the best of [his] knowledge," and that he was "aware that any false, fictitious, or fraudulent statements or claims may subject [him] to criminal, civil, or administrative penalties."

6.      Notwithstanding the above-referenced certifications by the School and Neumeister, throughout the Covered Period, Neumeister routinely (1) used his P-Card to pay for expenses that had nothing to do with his NIMH-funded research and instead were incurred for the benefit of himself, his family, or a personal friend (the "Friend"); and (2) allocated those expenses to NIMH grants, thus causing the School to pay the expenses using NIMH grant funds.

7.      More specifically, during the Covered Period, Neumeister regularly used his P-Card to pay for, among other things, airline tickets so that he could travel to and visit the above-referenced Friend or so that the Friend could travel to and visit him.  The Friend was not an approved participant in any of the studies that Neumeister was overseeing for the School, and as of mid-2013, the Friend was living in Salt Lake City, Utah.  During the Covered Period, Neumeister had no reason to travel to Salt Lake City in connection with any of his NIMH-funded research.  Nevertheless, between July 2013 and September 2014, Neumeister used his P-Card to purchase roundtrip airline tickets so that he could travel from New York City to Salt Lake City on at least eight occasions, and each time, he allocated the cost of those tickets to NIMH grants, thus causing NIMH to pay for the tickets.  During that same period, Neumeister also used his P-Card to pay for roundtrip airline tickets so that the Friend could travel from Salt Lake City to New York City on at least four occasions, and each time, Neumeister again allocated the cost of the travel to NIMH grants.  On the occasions when Neumeister traveled to Salt Lake City, he

also used his P-Card to pay for the cost of his lodging, bar tabs, and other expenses, and he allocated many of those expenses to NIMH grants.  In the written explanations that Neumeister provided to the School for the above-referenced travel expenses, Neumeister misrepresented the reason for the travel and expenses.

8.      Other examples of Neumeister misappropriating NIMH grant funds for travel associated with the Friend include: (1) a roundtrip airline ticket that Neumeister purchased so that he could travel from New York City to Chicago, Illinois, in October 2013 to see the Friend perform in a ballet there (the Friend was a professional ballet dancer who was then performing with a ballet company in Chicago); and (2) two roundtrip airline tickets that Neumeister purchased so that both he and the Friend could travel together from New York City to Miami, Florida, in January 2014.

9.      In addition to misappropriating tens of thousands of dollars in NIMH grant funds to pay for expenses associated with the Friend, Neumeister also misappropriated tens of thousands of dollars in funds from one or more of the School's expense accounts to pay for similar expenses.  For example, during the Covered Period, Neumeister charged the following expenses to one or more of the School's expense accounts (thus causing the School to pay for the expenses): (1) meals where he and the Friend dined at restaurants in New York City and Salt Lake City; (2) a week-long stay for the Friend at a resort hotel in Miami Beach, Florida; (3) and a new iPhone for the Friend after the Friend reported to Neumeister that the Friend's phone had been stolen.  Although the Government is not seeking to recover in this action for unauthorized expenses that Neumeister allocated to the School's expense accounts (as opposed to NIMH grants), such expenses are further evidence of Neumeister's misappropriation of funds to pay for expenses associated with the Friend.

4

10.     During the Covered Period, Neumeister also used his P-Card to pay for domestic and international travel for his family, none of whom was an approved participant in any of the NIMH-funded research that Neumeister was overseeing for the School.  Sometimes Neumeister allocated the expenses related to this unauthorized travel to NIMH grants and sometimes to one or more of the School's expense accounts.  For example, Neumeister used his P-Card to pay for a roundtrip airline ticket for his wife to travel from Hartford, Connecticut, to Washington, D.C., in November 2014, and he allocated the cost of the travel to an NIMH grant, thus causing NIMH to pay for it.  Similarly, Neumeister used his P-Card to pay for a roundtrip airline ticket for his wife to travel from Newark, New Jersey, to Vienna, Austria, in January 2014, but this time he allocated the cost of the travel to one of the School's expense accounts, thus causing the School to pay for it.

11.     In early 2015, one of Neumeister's supervisors at the School interviewed him after other employees of the School had conducted an audit of Neumeister's expenditures using his P-Card.  During that interview, Neumeister, among other things: (1) asked that the audit findings not be disclosed to others because it would jeopardize his job and his children's ability to attend the School without having to pay tuition; and (2) offered to pay back certain of the expenses that he had charged to the P-Card. Yet, shortly thereafter, when Neumeister was confronted with apparently fraudulent expenses, he denied much of the improper conduct. As of the date of this Complaint, Neumeister has not repaid any of the misappropriated funds.

12.     As a result of Neumeister's above-described conduct, he knowingly (1) presented, or caused the School to present, false or fraudulent claims to the Government for NIMH grant funds; and (2) made, used or caused to be made or used false records and/or statements that were material to false or fraudulent claims to the Government for NIMH grant funds.  Accordingly,

5

Neumeister is liable under the False Claims Act and the common law for damages and penalties associated with those false or fraudulent claims.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, over the remaining claims pursuant to 28 U.S.C. § 1345, and over all claims pursuant to the Court's general equitable jurisdiction.

14.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because, at all times relevant to this case, Neumeister resided and regularly conducted business in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## PARTIES

15.     Plaintiff is the United States of America.  Through its agency the Department of Health and Human Services ("HHS"), of which NIMH is a component agency, the Government awards and administers federal research grants.

16.     Defendant Alexander Neumeister is an individual who, throughout the Covered Period, resided in New York City.  At all relevant times, Neumeister was a faculty member of the School and the principal investigator for the NIMH-funded research grants at issue.

## FACTUAL ALLEGATIONS

**A.     The Application and Certification Process for the Relevant NIMH Research Grants**

17.     Through NIMH, one of the National Institutes of Health ("NIH") that are part of HHS, the United States provides grants for research to academic institutions.

18.     During the Covered Period, the School was a recipient of grant funding from NIMH.  The paragraphs below describe the process through which the School obtained grant funding from NIMH throughout the Covered Period.

19.     To initiate the grant funding process, one or more of the School's faculty members prepared a funding proposal that was used by the School to generate a grant application that was submitted to NIMH.  The grant application incorporated information from the funding proposal, including a detailed description of the procedures that would be followed in conducting the proposed research study.

20.     After generating a grant application, the School submitted the grant application to NIMH, thereby requesting funds for the proposed research. In submitting the grant application to NIMH, a representative of the School signed a certification on behalf of the School stating, *inter alia*, that "the statements herein are true, complete and accurate to the best of my knowledge," and that the representative would "agree to comply" with the terms of any resulting award.

21.     To the extent NIMH approved a grant application submitted to it by the School, NIMH did so with the expectation that the research study would be conducted consistent with the procedures described in the grant application, and that the NIMH grant funds would be used to pay for the research outlined in the application.

22.     Upon approving a grant application, NIMH sent the School a "Notice of Award." The Notice of Award stated that the grant was "based on the application submitted to, and as approved by," NIMH, and it identified various "Terms and Conditions" of the grant. Those "Terms and Conditions" included compliance with all applicable statutory and regulatory requirements, as well as the NIH Grants Policy Statement.  The NIH Grants Policy Statement provided, *inter alia*, that by submitting a grant application, the School "agree[d] to be fully

7

accountable for the appropriate use of any funds awarded and for the performance of the grant-supported project or activities resulting from the application." The NIH Grants Policy Statement also provided that the School was

> required to secure and retain a unique signature and dated assurance from the PD/PI [Program Director/Principal Investigator] for each submitted application, prior to submitting an application to the NIH. . . . Such an assurance must include at least the following certifications: 1) that the information submitted within the application is true, complete and accurate to the best of the PI's knowledge; 2) that any false, fictitious, or fraudulent statements or claims may subject the PI to criminal, civil, or administrative penalties; and 3) that the PI agrees to accept responsibility for the scientific conduct of the project and to provide the required progress reports if a grant is awarded as a result of the application.

23.     The Notice of Award further stated that "Acceptance of this award including the 'Terms and Conditions' is acknowledged by the grantee when funds are drawn down or otherwise obtained from the grant payment system." Accordingly, each time the School drew down federal funds in connection with a specific NIMH grant, the School re-certified to the accuracy of the statements in the grant application, and reaffirmed its responsibility for ensuring that the grant funds were used only for appropriate purposes.

24.     In addition to receiving grants from NIMH for which it applied directly, the School was also the recipient of NIMH grants (1) as a subcontractor of other grant recipients, and (2) as a transferee of grants that were previously awarded to other institutions and transferred to it. As a transferee of NIMH grants, the School certified that it would "comply with the policies, assurances and/or certifications listed in the [grant] application." Similarly, as a subcontractor of NIMH grants, the School agreed to be "subject to the terms and conditions of the Prime Award."

25.     Where the School was a direct recipient or a transferee recipient of NIMH grants, the School obtained NIMH grant funding via an online system operated by HHS called the

payment management system ("PMS").  Throughout the Covered Period, the School collected the expenses it incurred on its grants and periodically sought reimbursement for those expenses from NIMH by using PMS to draw down funds.  Where the School was a subcontractor of other grant recipients, the School was reimbursed for its grant-related expenses by the institution that received the Prime Award, and that institution, in turn, obtained NIMH grant funding to cover the School's expenses via PMS.

26.     When the School used PMS to draw down funds, it drew down funds for all of its active NIH grants at one time (whether NIMH grants or other NIH grants) via a so-called "pooled" account.  Each drawdown thus represented a single, lump-sum dollar amount that covered all of the School's reimbursable expenses over the relevant period for all of its NIH grants.  As set forth above, by the express terms of the Notice of Award for each grant, whenever the School conducted a drawdown of NIH funds from PMS in connection with a particular grant, the School acknowledged all of the terms and conditions of the grant.

27.     In connection with its drawdowns of funds from PMS, the School was required to submit to NIH, on a quarterly basis, a Federal Financial Report ("FFR") that, *inter alia*, identified, for each NIH grant, all of the School's cumulative expenditures on the grant to date.  At the conclusion of all of its activity in connection with a specific NIH grant, the School was also required to submit to NIH a final FFR for the grant that detailed all expenses charged to the grant.

28.     Each time the School submitted a quarterly or final FFR for a grant, a representative of the School certified that "the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and intent set forth in the award documents."

9

29.     When other institutions used PMS to draw down funds during the Covered Period, including institutions for which the School was a subcontractor, those other institutions followed the same process as described above.

30.     During the Covered Period, the School performed work in connection with numerous studies that were funded by NIMH grants.  Neumeister was the principal investigator for many of those studies.  Some of those studies were funded by NIMH grants for which the School applied directly, while others were funded by NIMH grants for which the School was a subcontractor or transferee recipient.

31.     The below NIMH grants are ones for which, during the Covered Period, the School applied directly and Neumeister served as the principal investigator.  During the Covered Period, the School drew down funds from PMS in connection with each of the below grants.  A portion of the funds that the School drew down in connection with these grants was used by the School to pay for Neumeister's annual salary and employment benefits.

| Study Name | NIMH Grant No. | Project Code |
| --- | --- | --- |
| KOR [Kappa Opioid Receptor] Depression | R01MH102556 | 103751 |
| A mGlu2/3 agonist in the treatment of PTSD | R34MH102871 | 103863 |
| Kappa Opioid Receptor Imaging in Anorexia | R21MH102035 | 102822 |

32.     The below NIMH grants are ones for which, during the Covered Period, the School was a transferee recipient and Neumeister served as the principal investigator.  During the Covered Period, the School drew down funds from PMS in connection with each of the below grants.  A portion of the funds that the School drew down in connection with these grants was used by the School to pay for Neumeister's annual salary and employment benefits.

| Study Name | NIMH Grant No. | Project Code |
|---|---|---|
| Norepinephrine Transport Imaging in Alcohol Dependence and Obesity | Rl1AA017540 | 101056 |
| Serotonin 1B Receptor Imaging in Pathological Gambling and Alcohol Dependence | R21AA018329 | 101058 |
| CB1 Receptor Imaging in Anorexia | R21MH094763 | 101435 |
| Kappa Opioid Receptor Imaging in PTSD | R21MH096105 | 101446 |
| CB1 Receptor PET Imaging Reveals Gender Differences in PTSD | R01MH096876 | 101663 |

33.     The below NIMH grants are ones for which, during the Covered Period, the School was a subcontractor of another grant recipient and Neumeister served as the principal investigator.  During the Covered Period, the School received funds from the Prime Award institution for each of the below grants.  A portion of the funds that the School received in connection with these grants was used by the School to pay for Neumeister's annual salary and employment benefits.

| Study Name | NIMH Grant No. | Project Code |
|---|---|---|
| Serotonin 1B Receptor Imaging in Major Depressive Disorder | R21MH081103 | 101017 |
| Serotonin 1B Receptor Imaging in PTSD with and without Co-Morbid Depression | R21MH085627 | 101020 |

**B.      Neumeister Was Authorized to Make Expenditures in Connection with the Research Studies He Was Overseeing, and to Allocate NIMH Grant Funds to Pay for the Expenditures**

34.     During the Covered Period, the School issued Procurement Cards ("P-Cards") to principal investigators like Neumeister, and those individuals had the ability to charge expenses related to the research studies they were overseeing to the P-Card.

35.    Neumeister was issued a P-Card in or about June 2012.  In connection with his receipt of the P-Card, Neumeister signed a statement acknowledging that he had read and understood the Cardholder Agreement for the P-Card, whose specific terms and conditions included: (1) that his use of the P-Card would be for "making financial commitments on behalf of [the School]"; (2) that the School would be liable for all charges made on the P-Card; (3) that use of the P-Card was "for approved purchases *only*"; and (4) that if the P-Card was used "for personal items," he "must forward a check, made payable to [the School], along with [the] monthly statement."

36.    At all times relevant to this case, the School required holders of P-Cards to reconcile the charges they made using their P-Cards by: (1) periodically providing receipts and written justifications for the charges; and (2) identifying to which specific federal grant or other funding source each of their P-Card charges should be allocated.

37.    The written justifications that P-Card holders were required to submit to the School were entered by the P-Card holders (or their designated proxy) into an electronic database that the School maintained (the "Database").  The written justifications are referred to herein as "Database billing comments."

38.    When the holder of a P-Card allocated expenses to studies that were funded by NIH research grants, including grants issued by NIMH, the School then drew down federal funds from PMS to cover the expenses.  By contrast, when the holder of a P-Card allocated expenses to one or more of the School's expense accounts, the School paid for the expenses using its own funds.

**C.    Neumeister Misappropriated NIMH Grant Funds for His Own Personal Use**

39.    On a regular basis from 2012 through 2014, Neumeister used his P-Card to pay for travel, meals, bar tabs, and other expenses — for himself, family members, and the Friend —

that were unrelated to any of the NIMH studies he was overseeing.  After incurring these unauthorized expenses, Neumeister frequently identified the expenses as having been incurred in connection with his NIMH research studies, and thus as appropriately allocated and charged to NIMH grants.  The following are among the NIMH grants to which Neumeister allocated unauthorized expenses during the Covered Period: R01MH102556; Rl1AA017540; R21AA018329; R21MH094763; R21MH096105; R01MH096876; R21MH081103; and R21MH085627.  As a result, the School drew down tens of thousands of dollars from NIH that it used to pay for such unauthorized expenses.

        1.    <u>Neumeister Used NIMH Funds to Pay for Travel and Entertainment for Himself and the Friend</u>

40.    During the period 2012 through 2015, Neumeister repeatedly used his P-Card to pay for airline tickets, lodging, and other travel-related expenses so that he could visit the Friend, or so the Friend could visit him. Although the expenses associated with these visits were of a personal nature and were not incurred for any purpose related to the NIMH-funded studies that Neumeister was overseeing, Neumeister identified many of these expenses as having been incurred in connection with his NIMH studies, and thereby causing the School to pay for them using funds it obtained from NIMH.

41.    The Friend was a professional ballet dancer who lived in New York City for a portion of 2012.  However, thereafter and for the remainder of the Covered Period, the Friend lived in Charlotte, North Carolina, and later in Salt Lake City, Utah.

42.    The Friend was not an approved participant in any of the research studies that Neumeister was overseeing for the School.

43.     Nonetheless, Neumeister allocated many of these expenses associated with the Friend to NIMH grants, thus causing the School to pay for them using funds it obtained from NIMH.

a.     *Unauthorized Travel to and from Salt Lake City*

44.     By mid-2013, the Friend was living in Salt Lake City, Utah.

45.     On multiple occasions during the period July 2013 through September 2014, Neumeister purchased airline tickets either for himself to travel from New York City to Salt Lake City or for the Friend to travel from Salt Lake City to New York City.  Several of these trips took place on a weekend.  Neumeister charged the cost of these tickets and associated fees to his P-Card and allocated the expenses to NIMH grants.  The chart below reflects such travel.

| Traveler | Departure Date | Traveling From/To | Return Date | Traveling From/To | Cost of Tickets and Fees | NIMH Grant Number to Which Cost Allocated |
|---|---|---|---|---|---|---|
| Neumeister | 7/18/13 | New York City ("NYC") to Salt Lake City ("SLC") | 7/20/13 | SLC to NYC | $562.60 | R01MH096876 |
| Neumeister | 11/14/13 | NYC to SLC | 11/16/13 | SLC to NYC | $575.00 | R01MH096876 |
| Neumeister | 12/21/13 | NYC to SLC | 12/22/13 | SLC to NYC | $995.10 | R21MH094763 |
| The Friend | 12/30/13 | SLC to NYC | 1/11/14 | NYC to SLC | $476.80 | R21MH094763 |
| Neumeister | 3/1/14 | NYC to SLC | 3/3/14 | SLC to NYC | $927.50 | R01MH096876 |
| Neumeister | 4/4/14 | NYC to SLC | 4/6/14 | SLC to NYC | $837.50 | R01MH096876 |
| The Friend | 5/7/14 | SLC to NYC | -- | -- | $332.00 | R21MH096105 |
| The Friend | 6/30/14 | NYC to SLC | 7/5/14 | SLC to NYC | $702.00 | R01MH096876 |
| The Friend | 7/30/14 | NYC to SLC | -- | -- | $335.00 | R01MH096876 |

| Neumeister | 8/7/14 | NYC to SLC | 8/9/14 | SLC to NYC | $2,078.70 | R01MH102556 |
| The Friend | 9/6/14 | NYC to SLC | 9/7/14 | SLC to NYC | $1,349.20 | R01MH096876 |
| The Friend | 9/29/14 | SLC to NYC | 10/5/14 | NYC to SLC | $537.96 | R01MH096876 |
| Neumeister | 11/15/14 | NYC to SLC | 11/16/14 | SLC to NYC | $1,874.70 | R01MH096876 |

46.     On the occasions where Neumeister traveled to Salt Lake City, he also used his P-Card to pay for his lodging, meals, bar tabs, local transportation, and other travel-related expenses.  Neumeister allocated many of these expenses — including costs associated with his lodging — to NIMH grants.  The lodging included multiple overnight stays at the Grand America Hotel, which at the time described itself as "Salt Lake City's Finest in Luxury Lodging" and the "only AAA Five Diamond hotel in Salt Lake City."

47.     For example, in connection with his stay at the Grand America Hotel between August 7, 2014, and August 10, 2014, Neumeister allocated the following expenses (among others) to NIMH grant number R01MH102556:  a total of $830.42 for his hotel room; $203.35 in expenses for what is listed on his hotel bill as "Grand Pool Bar Beverage"; a total of $56.49 for what is listed on his bill as "Grand Lobby Bar Food"; and $27.83 for what is listed on his bill as "Room Service Breakfast."

48.     Similarly, in connection with his stay at the Grand America Hotel from September 6, 2014, to September 7, 2014, Neumeister allocated the following expenses (among others) to NIMH grant number R01MH096876: a total of $252.22 for his hotel room; $207.17 for what is listed on his bill as "Grand Pool Bar Beverage"; $54.82 for what is listed on his bill as "Room Service Breakfast"; and $38.36 for what is listed on his bill as "GA Garden Café Lunch."

15

49.     Neumeister also allocated some of his Salt Lake City travel expenses to one or more of the School's expense accounts.  Such expenses included lunch for two at the Waldorf Astoria hotel restaurant in Park City, Utah, on March 2, 2014.  Neumeister's Database billing comments state that he attended this lunch with a specific doctor.  However, on March 2, 2014, the Friend posted on social media a picture of a plate of food with the following text: "Lunch at the Waldorf Astoria in park city #life #love #parkcity #waldorf #Sunday #lunch #meat."

50.     On multiple occasions, Neumeister's Database billing comments for expenses associated with his trips to Salt Lake City state that the expenses were incurred in connection with meetings with a specific individual affiliated with a particular university in Salt Lake City.  However, Neumeister did not meet with this individual in connection with any of these trips.

51.     Similarly, Neumeister's Database billing comments for the Friend's airline tickets to New York City typically represent that the expenses were incurred in connection with the Friend's role as a study participant in Neumeister's clinical trials.  However, as set forth above, the Friend was not an approved participant in any of the clinical trials that Neumeister was overseeing in connection with his role as a principal investigator at the School.

    b.    *Unauthorized Travel to and from Charlotte*

52.     As set forth above, the Friend lived in Charlotte, North Carolina, for a portion of the Covered Period.

53.     During a four-month period at the end of 2012 — from September 2012 to December 2012 — Neumeister purchased three roundtrip airline tickets to travel from New York City to Charlotte, charging the cost of the tickets and associated fees to his P-Card and allocating the expenses to NIMH grants.  In connection with these trips, Neumeister also used his P-Card to pay for lodging and other travel expenses (including a stay at the Ritz-Carlton Charlotte), and he

again allocated many of these expenses to NIMH grants.  The chart below reflects such travel.

At the time of these trips, Neumeister did not have any reason to travel to Charlotte in connection

with his NIMH research studies.  Moreover, two of the three trips involved Neumeister traveling

to Charlotte only for the weekend (*i.e.*, leaving for Charlotte on Saturday and returning to New

York City on Sunday).

| Traveler | Departure Date | Traveling From/To | Return Date | Traveling From/To | Cost of Flights and Fees | NIMH Grant Number to Which Cost Allocated |
|----------|----------------|-------------------|-------------|-------------------|--------------------------|--------------------------------------------|
| Neumeister | 9/1/12 | NY to Charlotte | 9/2/12 | Charlotte to NY | $534.10 | R11AA017540 |
| Neumeister | 10/13/12 | NY to Charlotte | 10/14/12 | Charlotte to NY | $291.10 | R21AA018329 |
| Neumeister | 12/16/12 | NY to Charlotte | 12/17/12 | Charlotte to NY | $377.10 | R21AA018329 |

54.     During the same four-month period identified above, Neumeister also used his P-

Card to pay for the Friend to travel from Charlotte to New York City, although he allocated the

expenses for that travel to one of the School's expense accounts.  Specifically, on September 21,

2012, Neumeister booked a flight for the Friend to travel from Charlotte to New York City on

December 24, 2012.  Neumeister forwarded the email he received confirming the travel to the

Friend on September 21, 2012.  The Friend responded by email dated September 23, 2012,

stating, "babe!!!!!!!!!!!!!!!!!!!!", to which Neumeister then responded, "What?  That's what you

asked me to do."  Neumeister also used his P-Card to book a flight for an individual with the

same surname as the Friend to travel from Fort Myers, Florida, to New York City on December

24, 2012, and as with the Friend's ticket, Neumeister allocated the cost of the ticket to one of the

School's expense accounts.

      c.     *Unauthorized Travel to and from Chicago*

55.      On or about October 1, 2013, the Friend traveled to Chicago, Illinois, to perform there with a ballet company.  In a social media post, dated September 16, 2013, the Friend wrote: "Two more weeks til Chicago with [my ballet company] performing one of my favorite ballets 'sleeping beauty' then NYC for a week!!!!  Happy with life[.]"

56.      The Friend was in Chicago performing with the ballet company for only a few days, during which Neumeister traveled from New York City to Chicago, using his P-Card and NIMH grant funds to pay for the trip.  Specifically, Neumeister flew to Chicago on October 4, 2013, and flew back to New York City on October 5, 2013, allocating the cost of his airfare ($341.80) to an NIMH grant.  Neumeister's Database billing comments for this trip reflected that the trip was for purposes of a "meeting" at a particular university in Chicago.  Yet, in an email dated September 29, 2013, Neumeister told an acquaintance that he was going to Chicago the following week to see the Friend perform with the ballet company; Neumeister wrote: "[The Friend] is with [a] ballet [company] in Salt Lake City, next week they [t]our to Chicago with sleeping beauty and I will see them performing, then [the Friend] spends a week in NYC before returning to SLC [Salt Lake City]."

57.      Neumeister also used his P-Card to pay for the Friend to travel from Chicago to New York City after the Friend's ballet company had finished its performances in Chicago. Specifically, Neumeister booked airline tickets for the Friend to travel from Chicago to New York City on October 6, 2013, and then from New York City to Salt Lake City, on October 13, 2013.  Neumeister charged the cost of this travel ($573.20) to an NIMH grant, falsely representing in the Database that the travel related to the Friend's status as a research subject in

an NIMH study.  Neumeister's Database billing comments for this travel stated: "Subject

transportation study participation 101663 [NIMH Grant No. R01MH096876]."

d.      <em>Unauthorized Travel to and from Florida</em>

58.      In addition to unauthorized travel to and from Charlotte, Salt Lake City, and

Chicago, Neumeister also booked unauthorized travel for himself and the Friend to travel to and

from Florida, charging the travel to his P-Card and allocating the expenses for the travel to

NIMH grants.  Specifically, Neumeister booked airline tickets for himself and the Friend to

travel together from New York City to Miami on January 7, 2014, and then from Miami back to

New York City on January 9, 2014.  Neumeister charged the cost of these tickets ($847.00) to his

P-Card and allocated half of the cost to an NIMH grant and half of the cost to one of the School's

expense accounts. The lodging, which was charged to an NIMH grant, included a stay at The

Standard Miami Beach hotel, which describes itself as being "less a 'hotel,' and more a spa with

guest rooms."

e.      <em>Additional Unauthorized Expenses Relating to the Friend</em>

59.      Neumeister also used his P-Card to pay for other unauthorized expenses

associated with the Friend, including numerous expenses that were allocated to one or more of

the School's expense accounts.

60.      As an initial matter, Neumeister treated the Friend to meals at restaurants on

multiple occasions.  Such meals included lunch at a restaurant in New York City on January 15,

2013, and dinner at another restaurant in New York City on July 9, 2013.  Neumeister charged

the cost of the meals ($83.13 and $184.25, respectively) to his P-Card and allocated the expenses

to one of the School's expense accounts.  On January 15, 2013, and July 9, 2013, respectively,

Neumeister forwarded to the Friend emails he had received confirming reservations for two at

19

the respective restaurants.  Neumeister's Database billing comments falsely stated that the January 15, 2013, lunch was attended by Neumeister and another doctor, and that the July 9, 2013, dinner was attended by Neumeister and a different doctor.

61.    In addition, Neumeister used his P-Card to pay for airfare for the Friend to travel to Miami, Florida, on March 13, 2014, and to stay at a resort hotel in Miami Beach from May 13, 2014, through May 22, 2014.  Neumeister also gave credit card authorization to the hotel to enable the Friend to charge, *inter alia*, food, beverages, and beach facilities, to Neumeister's P-Card.  Neumeister allocated the expenses for this trip (more than $4,300) to one of the School's expense accounts.

62.    Moreover, although the Friend was not an approved participant in any of the clinical trials Neumeister was overseeing for the School, Neumeister arranged for the Friend to receive numerous payments from the School during the Covered Period, totaling more than $10,000, for the Friend's purported role as a clinical trial subject.  The Friend was paid by check with funds from one of the School's expense accounts.  Four of the checks that were payable to the Friend list Neumeister's residential address at the time as the Friend's address, and Neumeister himself endorsed two of the checks that were made payable to the Friend.

63.    Neumeister's unauthorized expenses involving the Friend also included the purchase of an iPhone for the Friend.  Neumeister purchased this iPhone on June 17, 2012, after he had a lengthy email exchange with the Friend during which the Friend reported that the Friend's phone had been stolen.  After purchasing the iPhone, Neumeister forwarded the Friend an email from the Apple Store, dated June 17, 2012, that began, "Welcome to your new iPhone." Neumeister charged the iPhone to his P-Card and allocated the expense to one of the School's expense accounts.  Neumeister's Database billing comments included the following false

justification for the purchase: "Old equipment broke and could not be repaired.  [G]iven my extensive travel and off site PET/MR imaging at [a specific college], I nee[d] to stay connected with 2 separate study teams.  Charge to recruitment account."

64.     Because Neumeister allocated the expenses referenced in this subsection to one or more of the School's expense accounts — thus causing the School to pay for the expense using its own funds rather than NIMH grant funds — the Government is not seeking to recover for these expenses through this action.  However, these expenses further demonstrate Neumeister's pattern of misallocating funds to pay for travel, meals, or other unauthorized expenses associated with the Friend.

2.     Neumeister Used NIMH Funds to Pay for Travel for His Family

65.     On multiple occasions in 2013 and 2014, Neumeister used his P-Card to purchase airline tickets for members of his family to travel both domestically and abroad.  Although these travel expenses were of a personal nature, Neumeister allocated some of the expenses to NIMH grants and the rest to one or more of the School's expense accounts.  The below chart includes examples of the unauthorized family travel expenses, and identifies instances where the expense were allocated in full or in part to NIMH grants, thus causing the School to pay for the expenses using NIMH funds.

| Traveler(s) | Departure Date | Traveling From/To | Return Date | Traveling From/To | Cost of Flights and Fees | Source of Payment |
|---|---|---|---|---|---|---|
| Neumeister's Wife | 1/1/14 | NJ to Vienna, Austria | 1/5/14 | Vienna to NJ | $1,626.69 | School Expense Account |
| Neumeister & Neumeister's Son | 2/22/14 | New Haven, CT to Miami | 2/24/14 | Miami to New Haven | $1,260.00 | NIMH Grant R01MH096876 & School Expense Account |

| Traveler(s) | Departure Date | Traveling From/To | Return Date | Traveling From/To | Cost of Flights and Fees | Source of Payment |
|---|---|---|---|---|---|---|
| Neumeister's Wife | 11/8/14 | Hartford, CT to Wash., DC | 11/8/14 | DC to Hartford | $453.19 | NIMH Grant R01MH096876 & School Expense Account |

66.     In connection with the above-referenced family travel expenses, Neumeister provided false reasons to the School to justify using his P-Card to pay for the expenses.  For example, Neumeister's Database billing comments for the airline tickets for his wife's January 2014 travel to Vienna state, "collaboration recruitment account [associated with a particular school]" and "booking fee PTSD meeting recruitment account."  Neumeister has since acknowledged that the purpose of this travel was so that his wife could attend her father's funeral.

67.     Neumeister knew there was no basis for charging any portion of the above-referenced family travel expenses to NIMH grants.  Likewise, Neumeister knew there was no basis for charging any portion of the expenses associated with the Friend to NIMH grants.

68.     By allocating a portion of the family travel expenses and the expenses associated with the Friend to NIMH grants, Neumeister caused the School to use funds it obtained from the United States to pay for those expenses.  The School used federal funds received under at least the following NIMH grants to pay for these and other unauthorized expenses: R01MH102556; Rl1AA017540; R21AA018329; R21MH094763; R21MH096105; R01MH096876; R21MH081103; and R21MH085627.

69.     Had NIH known that Neumeister was allocating NIMH grant funds to pay for personal expenses relating to his family's travel or to the Friend, it would not have allowed the School to draw down funds (1) for the particular NIMH grants as to which funds were being

misallocated or (2) for any other NIMH grants for which Neumeister was the principal

investigator.

70.     As of the date of this Complaint, Neumeister has not repaid any of the

misappropriated funds.

### COUNT ONE

**Violation of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(A))**
**The Submission of, or Causing the Submission of, False Claims**

71.     The United States repeats and realleges the allegations in paragraphs 1 through 70

with the same force and effect as if set forth fully herein.

72.     The Government seeks relief against Neumeister under Section 3729(a)(1)(A) of

the FCA, 31 U.S.C. § 3729(a)(1)(A).

73.     As set forth above, Neumeister knowingly, or acting with deliberate ignorance

and/or reckless disregard of the truth, presented and/or caused to be presented to an officer,

employee or agent of the United States, either directly or indirectly, false or fraudulent claims for

payment or approval in connection with NIMH research grants.  Specifically, Neumeister

knowingly presented, or caused the School to present, false or fraudulent claims for

reimbursement for expenses that Neumeister represented were legitimately incurred in

connection with the NIMH grants, but, in fact, were of a personal nature and not properly

allocated to the NIMH grants.

74.     As a result of Neumeister's conduct, the United States, through HHS, NIH, and

NIMH, paid such false or fraudulent claims to the School.  Had the United States known of

Neumeister's conduct, it would not have paid those claims or any other claims associated with

grants for which Neumeister was the principal investigator.

75.     By reason of Neumeister's conduct, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

**COUNT TWO**

**Violation of the False Claims Act
(31 U.S.C. § 3729(a)(1)(B))
Use of False Statements**

76.     The United States repeats and realleges the allegations in paragraphs 1 through 70 with the same force and effect as if set forth fully herein.

77.     The Government seeks relief against Neumeister under Section 3729(a)(1)(B) of the FCA, 31 U.S.C. § 3729(a)(1)(B).

78.     As set forth above, Neumeister knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used or caused to be made or used false records and/or statements material to false or fraudulent claims in connection with the School's receipt of NIMH grant funds.  Specifically, Neumeister knowingly made, or caused the School to make, false or fraudulent records and/or statements — in the form of, *inter alia*, false explanatory narratives in the Database and false certifications that the NIMH grant funds would be used only for the purposes and intent set forth in the award documents — that were material to false or fraudulent claims made by the School for receipt of NIMH grant funds.

79.     As a result of Neumeister's conduct, the United States, through HHS, NIH, and NIMH, paid such false or fraudulent claims to the School.  Had the United States known of Neumeister's conduct, it would not have paid those claims or any other claims associated with grants for which Neumeister was the principal investigator.

80.     By reason of Neumeister's conduct, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT THREE

### Conversion

81.     The United States repeats and realleges the allegations in paragraphs 1 through 70 with the same force and effect as if set forth fully herein.

82.     The NIMH grant funds that were paid to the School in connection with the NIMH grants but used to reimburse Neumeister for personal expenses associated with himself, his family or the Friend are the lawful property of the United States of America.

83.     Neumeister knowingly converted the above-referenced funds for his own use, in derogation of the rights of the United States, which is entitled to these funds.

84.     As a result of such conversion, the United States has been damaged in an amount to be determined at trial.

## COUNT FOUR

### Unjust Enrichment

85.     The United States repeats and realleges the allegations in paragraphs 1 through 70 with the same force and effect as if set forth fully herein.

86.     When the School drew down federal funds in connection with the NIMH grants at issue in this case, it used a portion of those funds to pay Neumeister his annual salary and employment benefits.

87.     Had the United States known of Neumeister's conduct, it would not have allowed the School to draw down federal funds in connection with the NIMH grants at issue in this case, including for the purpose of paying Neumeister his annual salary and employment benefits.

88.     Accordingly, Neumeister received salary and employment benefits to which he was not entitled, and therefore was unjustly enriched.  The circumstances of these payments are such that, in equity and good conscience, Neumeister should not retain these payments, the amount of which is to be determined at trial.

## COUNT FIVE

### Payment by Mistake of Fact

89.     The United States repeats and realleges the allegations in paragraphs 1 through 70 with the same force and effect as if set forth fully herein.

90.     The United States seeks relief against Neumeister to recover monies paid under mistake of fact.

91.     The United States made payments to the School in connection with the NIMH grants at issue in this case based on a mistaken and erroneous understanding that the funds paid were being used in accordance with the "Terms and Conditions" of the NIMH grants at issue in this case.

92.     Had the United States known of Neumeister's conduct, it would not have allowed the School to draw down federal funds in connection with the NIMH grants at issue in this case.

93.     By reason of the foregoing, the United States has sustained damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, the United States requests that the Court enter judgment in its favor and against Neumeister as follows:

1.     For Counts One and Two, awarding treble the amount of actual damages incurred by the United States;

2.      For Counts One and Two, assessing an appropriate civil penalty for each false

claim and false statement or record, as provided for by the False Claims Act;

3.      For Counts One and Two, awarding costs, pursuant to 31 U.S.C. § 3729(a)(3);

4.      For Counts Three, Four, and Five, awarding damages in an amount to be

determined at trial, together with costs and interest; and

5.      Awarding such further relief as is proper.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable.

Dated:  New York, New York
         November 28, 2017

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

By:      s/ Anthony J. Sun
CHRISTOPHER B. HARWOOD
ANTHONY J. SUN
Assistant United States Attorneys
86 Chambers St., 3rd Floor
New York, New York  10007
(212) 637-2728 / 2810
christopher.harwood@usdoj.gov
anthony.sun@usdoj.gov